IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | | |
|---|---|---|
| BEN GARRISON | ) | |
| | ) | |
|       Plaintiff, | ) | |
| | ) | |
| v. | ) | Case 3:20-cv-00040-GEC |
| | ) | |
| | ) | |
| ANTI-DEFAMATION LEAGUE | ) | |
| | ) | |
|       Defendant. | ) | |
| | ) | |

# MEMORANDUM IN OPPOSITION
# TO DEFENDANT'S OMNIBUS MOTION TO DISMISS

Plaintiff, Ben Garrison ("Plaintiff"), by counsel, pursuant to Local Civil Rule 11(c)(1), respectfully submits this Memorandum in Opposition to the omnibus motion to dismiss [*ECF No. 11*] filed by defendant, Anti-Defamation League ("Defendant").

## I.   INTRODUCTION

The "permanent, extensive and injurious" nature of libel is well-known:

"A slander is preserved in no fixed or permanent form.  It ordinarily soon fades out and is forgotten like the sound that carries it.  But one who publishes a libel in a newspaper or pamphlet which circulates among many people, or even in a private letter, thereby places it in permanent form where it will be more likely to continue in existence and to be read by many people, and where he causes it to be published in a newspaper or magazine he thereby evidences his intention that the readers shall read it, so that the natural and probable effect of publishing a libel is far more permanent, extensive and injurious to the victim than the mere speaking of the words it contains to one or more persons."

*James v. Powell*, 154 Va. 96, 113-114, 152 S.E 539 (1930) (quoting *Maytag v. Cummins*, 260 F. 74, 80 (8th Cir. 1919)).  In *Fuller v. Edwards*, the Virginia Supreme Court

recognized that "[o]ne's right to an unimpaired limb and to an unimpaired reputation are, in each instance, absolute and has been since common law governed England.  Indeed, an impaired reputation is at times more disastrous than a broken leg." 180 Va. 191, 198, 22 S.E.2d 26 (1942) (cited in *Gazette, Inc. v. Harris*, 229 Va. 1, 7, 325 S.E.2d 713 (1985) ("In Virginia, as in other states, the law of defamation historically has protected a basic interest.   The individual's right to personal security includ[ing] his uninterrupted entitlement to enjoyment of his reputation.")); *see id. Rosenblatt v. Baer*, 383 U.S. 75, 92-93 (1966) ("'Society has a pervasive and strong interest in preventing and redressing attacks upon reputation.'  The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty … Surely if the 1950's taught us anything, they taught us that the poisonous atmosphere of the easy lie can infect and degrade a whole society.").

This is an action for defamation, conversion and trespass.  The case arises out of Defendant's false accusations that Plaintiff, a cartoonist, engaged in anti-Semitic, racist and bigoted conduct.  Defendant holds itself out as "the world's leading organization fighting antisemitism" [https://www.adl.org/what-we-do] with extensive operations in every state through a network of 25 regional offices, partnerships, agents and other contacts.  [https://www.adl.org/who-we-are/our-organization; https://www.adl.org/what-we-do/anti-semitism/antisemitism-in-the-us].[1]   Defendant is well-aware that false accusations of anti-Semitism, racism and bigotry are insidious and actionable invectives.

---

[1]     Defendant engages in "continuous and systematic general business contacts" with Virginia, including its repeated appearances in litigation as *amicus curiae*. [*See, e.g.,* https://www.adl.org/search?keys=Virginia].

*See, e.g., Sweeney v. Schenectady Union Publ. Co.*, 122 F.2d 288, 290-291 (2nd Cir. 1941, *aff'd*, 316 U.S. 642 (1942) ("in a country still dedicated to religious and racial freedom decent, liberty-loving people … still are greatly offended by the narrow-minded injustice of the bigots who see individuals only en masse and condemn them merely because their ancestors were of a certain race or they themselves are of a certain religion.  Those who hate intolerance are prone to regard the person who believes in and practices acts of intolerance with aversion and contempt" – held that calling someone an anti-Semite or a racist constitutes libel *per se*); *Stuart v. Anti-Defamation League of B'Nai B'rith,* 127 N.Y.S.2d 362, 363-64 (Sup. Ct. N.Y. Co. 1953) (denying motion to dismiss with respect to cause of action concerning statement "that the plaintiff was 'being subsidized' in the performance of his office as editor 'by a known anti-Semite'"); *see id. Sandmann v. New York Times*, Case 2:20-cv-00023 (E.D. Ken. Oct. 1, 2020) (statement that plaintiff, a white high school student, "blocked" the way of a Native-American activist and wouldn't allow him to "retreat" "conveys a defamatory meaning because it imputes to Sandmann racist conduct"); *Crozier for A.C. v. Westside Community School District*, 2020 WL 5223512, at * 6 (8th Cir. 2020) (teacher defamed student "by falsely labeling her as a racist who uses the 'N-word'"); *La Liberte v. Reid*, 966 F.3d 79, 92 (2nd Cir. 2020) ("A reader could have understood the July 1 Post as equating La Liberte's conduct with archetypal racist conduct, which is a provable assertion of fact, and therefore actionable."); *Chef's Warehouse, Inc. v. Wiley*, 2019 WL 4640208, at * 8-9 (S.D.N.Y. 2019) (plaintiff stated a claim of defamation where the defendant sent an email and posted on social media that plaintiff had "a policy of supporting racist business practices" – "Assuming that Chefs' Warehouse's allegations are true, it is plausible that Wiley –

who presumably would have known about Chefs' Warehouse's business practices as the Business Agent for Local 1430 – acted maliciously when making allegedly false statements about Chefs' Warehouse's 'policy' or a 'history' of 'supporting racist business practices'"); *Conejo v. Am. Fed'n of Gov't Emps., AFL-CIO*, 377 F.Supp.3d 16, 29 (D. D.C. 2019) ("Indisputably, … falsely accusing an individual … of being a racist" is a statement that "would make [him] appear 'odious' or 'infamous.'"); *see also* https://www.merriam-webster.com/dictionary/anti-Semite (an "anti-Semite" is "a person who has a hostile, prejudiced attitude toward Jews").

There is no scenario in which the word "anti-Semite" is not pejorative and intentionally hurtful. To suggest that repulsive hate speech, such as branding someone "anti-Semitic", is a "pure opinion" protected by the First Amendment goes against, indeed guts, the entire mission of the Anti-Defamation League. Are the repugnant voices of white supremecists also "opinions" protected by the First Amendment?

Plaintiff commenced this action on July 10, 2020. In his complaint, Plaintiff alleges that the Defendant published multiple false and defamatory statements within the last year, including an intentionally doctored cartoon published and republished on Defendant's website (without Plaintiff's permission) – a cartoon that makes it appear "to ADL's donors, members and the public that Garrison was, in fact, anti-Semitic and racist." [*ECF No. 1 ("Compl."), ¶¶ 6, 15, 16, 17*].[2] Plaintiff asserts that Defendant is at

---

[2]    The cartoon doctored by Defendant falsely attributes to Plaintiff statements that he never made, including "gutless goyim" and "retarded goyim". [https://www.adl.org/resources/backgrounders/jewish-control-of-the-federal-reserve-a-classic-antisemitic-myth]. The word "goyim" is a disparaging Yiddish and Hebrew word for non-Jews. https://www.adl.org/education/references/hate-symbols/the-goyim-knowshut-it-down].

home in Virginia, and is subject to general and specific personal jurisdiction in Virginia. [*Compl., ¶ 11*].  On November 30, 2020, Defendant filed an "omnibus" motion to dismiss pursuant to Rules 12(b)(2), 12(b)(3), and 12(b)(6).  In the alternative, Defendant requests the Court to transfer the case to the United States District Court for the District of Columbia pursuant to 28 U.S.C. § 1404(a). [*ECF No. 11*].

For the reasons stated below, Defendants' omnibus motion should be denied.

## II.  <u>DISCUSSION</u>

### A.  <u>*Defendant Is Subject To Personal Jurisdiction*</u>

When, as here, "the court addresses the personal jurisdiction question by reviewing only the parties' motion papers, affidavits attached to the motion, supporting legal memoranda, and the allegations in the complaint, a plaintiff need only make a prima facie showing of personal jurisdiction to survive the jurisdictional challenge." *Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir. 2016); *id. Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 276 (4th Cir. 2009) (citation omitted).  In reviewing the matter, the Court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction. *Sneha Media & Entm't, LLC v. Associated Broad. Co. P LTD*, 911 F.3d 192, 196 (4th Cir. 2018); *New Wellington Fin. Corp. v. Flagship Resort Dev. Co.*, 416 F.3d 290, 294 (4th Cir. 2005) (citations and quotations omitted).  "If a plaintiff makes the requisite showing, the defendant then bears the burden of presenting a 'compelling case,' that, for other reasons, the exercise of jurisdiction would be so unfair as to violate due process." *Reynolds Foil, Inc. v. Pai*, 2010 WL 1225620, at * 1 (E.D. Va. 2010) (quoting *Burger King v. Rudzewicz*, 471 U.S. 462, 477-78 (1985)).

For a Court to "assert personal jurisdiction over a nonresident defendant, two conditions must be satisfied: (1) the exercise of jurisdiction must be authorized under the state's long-arm statute; and (2) the exercise of jurisdiction must comport with the due process requirements of the Fourteenth Amendment." *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003). "Because Virginia's long-arm statute extends personal jurisdiction to the outer bounds of due process, the two-prong test collapses into a single inquiry when Virginia is the forum state." *Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co., Ltd.*, 682 F.3d 292, 301 (4th Cir. 2012). "A Virginia court thus has jurisdiction over a nonresident defendant if the exercise of such jurisdiction is consonant with the strictures of due process." *Id.* "A court's exercise of jurisdiction over a nonresident defendant comports with due process if the defendant has 'minimum contacts' with the forum, such that to require the defendant to defend its interests in the state 'does not offend the traditional notions of fair play and substantial justice.'" *Carefirst*, 334 F.3d at 397 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). The requirements of the Due Process clause can be met through establishing either general or specific jurisdiction. *See, e.g., Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414-415 (1984).

Construing Plaintiff's allegations in the light most favorably to him, there is no question that Plaintiff has made a prima facie showing as to both general and specific personal jurisdiction.

1.   ***General Jurisdiction***

General jurisdiction exists whenever a "foreign" corporation (sister-state or foreign-country) engages in "continuous and systematic general business contacts" with

the forum State. *Witt v. Reynolds Metals Co.*, 240 Va. 452, 454-455, 397 S.E.2d 873 (1990) (citing *International Shoe Company v. Washington*, 326 U.S. 310, 318 (1945) (general jurisdiction exists where a foreign corporation's "continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities.")); *id.* *Hall*, 466 U.S. at 416 (the pertinent question is whether defendant had "continuous and systematic general business contacts" with the forum state); *Bay Tobacco, LLC v. Bell Quality Tobacco Products, LLC*, 261 F.Supp.2d 483, 497 (E.D. Va. 2003) ("this Court must determine whether it may exercise general jurisdiction over Bell and Continental, meaning Bay must prove that each defendant has fairly extensive, continuous, and systematic contacts with Virginia").[3]

Since *International Shoe* and *Hall*, the United States Supreme Court has explained that, "[a] court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (cited in *Daimler A.G. v. Bauman*, 571 U.S. 117, 127 (2014)). There is no single formula, exclusive affiliation or set of circumstances that establishes when a

---

[3]       "[T]he Court is convinced that … Continental transacted a fair amount of business in Virginia and derived substantial revenue therefrom.  What the Court knows about Continental's contact with Virginia is that, over a period of time, Continental shipped its product directly into the Commonwealth anticipating that it would be sold to Virginia consumers.  Thus, it appears that Continental purposefully directed its business activities toward Virginia and could reasonably expect that it might be subject to jurisdiction in the Commonwealth.  The Court finds that it does not offend the due process protections of the Constitution to exercise personal jurisdiction over Continental. 261 F.Supp.2d at 497-498.

corporation is "essentially at home" in a given State. The place of incorporation and principal place of business are "paradig[m]"[4] places where a corporation is "essentially at home", *Daimler*, 571 U.S. at 137, **but**, as the Virginia Supreme Court held in *Witt v. Reynolds Metal Co.*, a foreign corporation may be "essentially at home" in Virginia if it has a "significant presence" in Virginia, *i.e.*, if it is "present in the forum" and "engaging in substantial, on-going business". 240 Va. at 454-456, 397 S.E.2d at 875-876 ("A foreign corporation, then, which has its principal place of business in the forum, or otherwise engages in a persistent course of systematic and substantial business activities in the forum state may be subjected to personal jurisdiction there … We find that the requirements of the due process clause are not violated by subjecting Reynolds to personal jurisdiction in the Circuit Court of Henry County on a cause of action arising out of events unrelated to the business conducted in the Commonwealth.").

In *BASF Plant Science, LP v. Commonwealth Scientific and Industrial Research Organization*, 2019 WL 2017541 (E.D. Va. 2019), counterclaim defendant, Cargill, was a Delaware corporation with its principal place of business in Minnesota. Counterclaim Plaintiff, CSIRO, argued that Cargill had "robust and systematic contacts" with Virginia, including employees in Virginia; seven (7) business locations in Virginia cities; land ownership in Virginia; and the fact that Cargill created "a large quantity of product here in Virginia." The District Court agreed. The concluded that "[i]t is difficult to imagine how Cargill could not anticipate being haled into this Court for this dispute. To begin, Cargill has an extensive presence in this Commonwealth. It employs 1,800 employees, owns land in Virginia, it is registered to do business here, and maintains business

---

[4]       "Paradigm" means a typical example or pattern of something: a framework. [https://www.merriam-webster.com/dictionary/paradigm].

locations throughout the Commonwealth.  Accordingly, the Court is of the opinion that Cargill has purposefully availed itself of Virginia; its laws; and, consequently, its jurisdiction." 2019 WL 2017541 at * 3.

The Defendant in this action is heavily engaged in business activity in Virginia. [*Compl., ¶ 11*].  Defendant's 2018 and 2019 tax returns (Form 990), which are matters of public record available on Defendant's website [https://www.adl.org/who-we-are/annual-reports-financial-information], demonstrate (a) that ADL maintains numerous agents in Virginia, including CVENT (one of ADL's highest paid fundraisers who raised $2,034,065 for ADL in 2019 alone) and Attain, LLC (one of the ADL's highest paid management, strategy and consultants in 2019); and (b) that ADL is registered and licensed to solicit contributions in Virginia; and actively solicits and receives donations from Virginians, the precise sum of which is unknown without discovery.  Further, for over fifteen (15)+ years, Defendant has regularly partnered with organizations in Virginia; has regularly investigated matters and reported on matters unique to Virginia, especially the Unite The Right rally in Charlottesville; has repeatedly appeared in Virginia Courts[5] as *amicus curiae* in various matters of significance to Defendant's business and mission; and has provided financial support for Virginia partners and projects, including the Communities Overcoming Extremism: The After Charlottesville Project (COE), a capacity-building project convened between 2018 and 2019 by a bipartisan coalition of partners.  [https://www.adl.org/search?keys=Virginia]; *Daimler*,

---

[5]     *See, e.g., Updegrove v. Herring*, Case 1:20-cv-01141-CMH-(Document 29-1); *Commonwealth v. Trump*, Case 1:17-cv-00116-LMB-TCB (Document 63); *Grimm v. Gloucester County School Board*, Appeal 15-2056; *Bostic v. Schaeffer*, Appeal 14-1167 (Doc 164-1); *Liberty University v. Lew*, Appeal 10-2347 (Doc 185).  Defendants has appeared in Virginia State and Federal Court going back almost forty (40) years to *Cramer v. Virginia Commonwealth University*, 586 F.2d 297 (4th Cir. 1978).

571 U.S. at 151 (Sotomayor, J., concurring) ("When a corporation chooses to invoke the benefits and protections of a State in which it operates, the State acquires the authority to subject the company to suit in its courts."); *International Shoe*, 326 U.S. at 319 ("[T]o the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state" such that an "obligatio[n] arise[s]" to respond there to suit).  Justice Sotomayor's observations in *Daimler* bear repeating:

> "What has changed since *International Shoe* is not the due process principle of fundamental fairness but rather the nature of the global economy.  Just as it was fair to say in the 1940's that an out-of-state company could enjoy the benefits of a forum State enough to make it 'essentially at home' in the State, it is fair to say today that a multinational conglomerate can enjoy such extensive benefits in multiple forum States that it is 'essentially at home' in each one."

571 U.S. at 156.

Viewing Plaintiff's allegations in the light most favorable to him and resolving all reasonable inferences in his favor, Defendant's contacts with Virginia are extensive, systematic and continuous over a decade or more.  The ADL is at home in Virginia.

## 2.    *Specific Personal Jurisdiction*

In order for a State court to exercise specific jurisdiction, "the suit" must "aris[e] out of or relat[e] to[6] the defendant's contacts with the forum". *Daimler*, 571 U.S. at 127 (quoting *Hall*, 466 U.S. at 414 fn. 8)); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-473 (1985).  In other words, there must be "an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear*, 564 U.S. at 919.

---

[6]    A claim "relates to" a defendant's forum conduct if it has a "connect[ion] with" that conduct. *International Shoe*, 326 U.S. at 319.

In assessing specific jurisdiction, Courts employ a three-part test to determine whether the exercise of specific jurisdiction over a nonresident defendant comports with the requirements of due process.  Courts evaluate: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiff['s] claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *ESAB Grp., Inc. v. Zurich Ins., PLC*, 685 F.3d 376, 391 (4th Cir. 2012).

In deciding whether it can exercise specific personal jurisdiction over a defendant, "a court must weigh the totality of the facts before it." *Perdue Food, LLC v. BRF S.A.*, 814 F.3d 185, 189 (4th Cir. 2016).  The Court "should not merely … count [a defendant's] contacts [with the forum state] and quantitatively compare this case to other preceding cases." *Carefirst*, 334 F.3d at 397.  "Even a single contact may be sufficient to create jurisdiction when the cause of action arises out of that single contact, provided that the principle of fair play and substantial justice is not thereby offended." *Id.*  The "primary concern" is "the burden on the defendant." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980).

Plaintiff easily makes a prima facie showing of specific personal jurisdiction. *Compare, e.g., Blue Ridge Bank, Inc. v. Veribanc*, 755 F.2d 371, 374 (4th Cir. 1985) (the defendant "obviously knew that Dorfman was going to write an article that included the allegedly libelous information about Blue Ridge and that the article could find its way into the Commonwealth of Virginia.  By requiring Dorfman to reveal his source of financial information Veribanc obviously expected to receive additional orders from customers who read the information in the article.  Because of this expectation Veribanc

could reasonably expect to be hailed into court, on an allegation of false information supplied to Dorfman by Veribanc, in any forum in which Dorfman's article appeared … Veribanc's fifty-seven contacts with its subscribers in Virginia add strength to the exercise of personal jurisdiction over Veribanc"); *Gubarev v. BuzzFeed*, 253 F.Supp.3d 1149, 1159 (S.D. Fla. 2017) ("When Defendants published their unverified Dossier via their website and mobile application, Defendants knew it would be viewed around the world, and given the international scope of its contents, should have anticipated that the effects of the publication might be felt in different fora, including the fora where Plaintiffs are located.  Accordingly, Defendants cannot claim surprise at being haled into court in the Southern District of Florida.").  Defendant published the defamatory statements to its online readers and to online social media followers in Virginia.  Through its active website on which the defamatory statements appear, https://www.adl.org/, Defendant sought donations from Virginians.  Litigating this case in Virginia will not impose any burden on Defendant.  In fact, Defendant routinely appears in Virginia Courts.  And, it is beyond dispute that the Commonwealth of Virginia has a significant interest in exercising jurisdiction over those who commit torts (defamation) within its territory. *Compare, e.g., Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 776 (1984) ("it is beyond dispute that New Hampshire has a significant interest in redressing injuries that actually occur within the State … New Hampshire may rightly employ its libel laws to discourage the deception of its citizens.").  Lastly, litigating the case in Virginia will ensure that the dispute is resolved in a fair and efficient way in a legal forum chosen by Plaintiff and a business forum utilized by Defendant for over a decade.  The exercise of specific personal jurisdiction over Defendant is constitutionally reasonable.

**B.**     *Virginia Is A Proper Venue*

When a defendant challenges venue under Federal Rule of Civil Procedure

12(b)(3), "the plaintiff bears the burden of establishing that venue is proper." *Resort*

*Funding, LLC v. Holt*, 2013 WL 6147091, at * 1 (E.D. Va. 2013) (quoting *Bartholomew*

*v. Va. Chiropractors Ass'n, Inc.*, 612 F.2d 812, 816 (4th Cir. 1979)).   "To survive a

motion to dismiss for improper venue when no evidentiary hearing is held, the plaintiff

need only make a prima facie showing of venue." *Id.* (quoting *Mitrano v. Hayes*, 377

F.3d 402, 405 (4th Cir. 2004)).   In reviewing a Rule 12(b)(3) motion, the Court must

construe all factual inferences in the plaintiff's favor. *Colonna's Shipyard, Inc. v. City of*

*Key West, Fla.*, 735 F.Supp.2d 414, 416 (E.D. Va. 2010) (citations omitted).

Title 28 U.S.C. § 1391 governs the venue in all civil actions brought in District

Courts of the United States.   Pursuant to § 1391(b)(1), a civil action may be brought in a

judicial district "in which any defendant resides, if all defendants are residents of the

State in which the district is located."   For all venue purposes, "an entity [such as the

Defendant in this case] with the capacity to sue and be sued in its common name under

applicable law … shall be deemed to reside, if a defendant, in any judicial district in

which such defendant is subject to the court's personal jurisdiction with respect to the

civil action in question". *28 U.S.C. § 1391(c)(2)*.

Because Defendant is subject to the Court's personal jurisdiction, venue is proper.

**C.**     *This Case Should Not Be Transferred*

Title 28 U.S.C. § 1404(a) provides that for the "convenience of the parties and

witnesses" and "in the interest of justice, a district court may transfer any civil action to

any other district … where it might have been brought."[7]  Section 1404(a) is "intended to place discretion in the district court to adjudicate motions for transfer according to an individualized, case-by-case consideration of convenience and fairness." *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964)).   In deciding whether to exercise this discretion, courts typically consider a number of factors, including: (1) the plaintiff's choice of forum, (2) witness convenience and ease of access to the sources of proof; (3) the convenience of the parties, and (4) the interests of justice. *See, e.g., Fitzgibbon v. Radack*, 597 B.R. 836, 842 (E.D. Va. 2019) (quoting *Trs. Of the Plumbers & Pipefitters Nat. Pension Fund v. Plumbing Servs., Inc.*, 791 F.3d 436, 444 (4th Cir. 2015)); *Heinz Kettler GmbH & Co. v. Razor USA, LLC*, 750 F.Supp.2d 660, 667 (E.D. Va. 2010).

A party seeking transfer bears the "**heavy burden** of showing that the balance of interests weighs strongly in [its] favor in a motion to transfer." *Arabian v. Bowen*, 966 F.2d 1441, at * 1 (4th Cir. 1992) (unpublished opinion) (emphasis added) (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947) ("unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.")); *Fitzgibbon*, 597 B.R. at 841 ("In fact, Radack must show that the balance of convenience among the parties and witnesses 'is beyond dead center, and strongly favors the transfer sought'") (quoting *Medicenters of America, Inc. v. T&V realty & Equip, Corp.*, 371 F.Supp. 1180, 1184 (E.D. Va. 1974)).  When reviewing a motion to transfer under § 1404(a), the court must view all facts in the light most favorable to the party opposing transfer. *See, e.g.,*

---

[7]      Plaintiff agrees that this action might have been brought in the United States District Court for the District of Columbia, where Defendant is also subject to personal jurisdiction and, therefore, resides for purposes of 28 U.S.C. § 1391(b)(1).

*Innovative Communications Technologies, Inc. v. Vivox, Inc.*, 2012 WL 4738979, at * 4 (E.D. Va. 2012) ("[f]or the purposes of these motions [to transfer venue], the Court 'must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction.'" (quoting *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989)); *see id. Tharpe v. Lawidjaja*, 2012 WL 5336208, at * 1 (W.D. Va. 2012).

### 1.   *Plaintiff's Choice of Forum*

The first factor in the transfer analysis is Plaintiff's choice of venue.  "That choice is typically entitled to 'substantial weight,' especially where the chosen forum is the plaintiff's home forum or bears a substantial relation to the cause of action." *Heinz Kettler*, 750 F.Supp.2d at 667 (quoting *Koh v. Microtek Intern., Inc.*, 250 F.Supp.2d 633, 637 (E.D. Va. 2003)).  A plaintiff filing suit in a district where he is not a resident "loses **_only some_** of the deference given [his] choice of venue." *Eastern Scientific Marketing, Inc. v. Tekna-Seal, Inc.*, 696 F.Supp. 173, 179 (E.D. Va. 1988) (emphasis added); *id. Samsung Electronics Co., Inc. v. Rambus, Inc.*, 386 F.Supp.2d 708, 716 (E.D. Va. 2005) even when plaintiff's choice of forum is neither the nucleus of operative facts, nor the plaintiff's home forum, "the plaintiff's choice of forum is certainly a relevant consideration so long as there is a connection between the forum and the plaintiff's claim that reasonably and logically supports the plaintiff's decision to bring the case in the chosen forum.").  The *Rambus* Court held as follows:

> "Considering Samsung has neither its headquarters nor its principal place of business in this district, but that some of the factual nexus for the claims asserted in the FAC occurred in this district, it is appropriate neither to accord Samsung's choice of forum great weight nor to unduly minimize that election.  Instead, Samsung's choice of forum will be respected as legitimate and will be considered in striking the balance respecting transfer."

386 F.Supp.2d at 716-717.

In this case, even though Plaintiff is a citizen of Montana, there is a factual nexus to the forum that logically supports Plaintiff's decision to bring the case here. Plaintiff sells cartoons and does business in Virginia. He has a social media following in Virginia. His cartoons are seen in Virginia. Here, as in *Keaton v. Hustler Magazine, Inc.*, the false statements caused substantial harm in Virginia, where the statements were circulated by Defendant and its agents, and republished by third-parties. 465 U.S. 770, 777 (1984) ("The tort of libel is generally held to occur wherever the offending material is circulated. Restatement (Second) of Torts § 577A, Comment a (1977). The reputation of the libel victim may suffer harm even in a state in which he has hitherto been anonymous. The communication of the libel may create a negative reputation among the residents of a jurisdiction where the plaintiff's previous reputation was, however small, at least unblemished."); *compare Fitzgibbon*, 597 B.R. at 842 (noting that "the effects of the allegedly defamatory remarks were felt in this forum").

Accordingly, the first factor – Plaintiff's choice of forum – weighs against transferring the case to the District of Columbia.

### 2. *Convenience of the Parties*

The second factor in the analysis is the convenience of the parties. As to this factor, Court courts typically consider "ease of access to sources of proof, the costs of obtaining witnesses, and the availability of compulsory process." *Heinz Kettler*, 750 F.Supp.2d at 668 (quoting and citing *Rambus, Inc.*, 386 F.Supp.2d at 717 fn. 13)). Convenience to parties alone will rarely justify transfer, particularly where, as here, transfer would merely "shift the balance of inconvenience" from one side to the other.

*See, e.g., Eastern Scientific Marketing*, 696 F.Supp. at 180.  The first point to consider in assessing party convenience is generally the parties' respective residences.  *See Fitzgibbon*, 597 B.R. at 842; *JTH Tax, Inc. v. Lee,* 482 F.Supp.2d at 738.  But "residence is not a controlling factor and may be outweighed in the context of a particular case by countervailing considerations relevant to the convenience of the witnesses and the interest of justice." *Fitzgibbon*, 597 B.R. at 842 (quoting 15 Fed. Prac. & Proc. Juris. § 3849 (4th ed.)).

Given its continuous and systematic contacts with Virginia and its vast world-wide reach and resources, Defendant fails to show how or why this forum is inconvenient to it.  Indeed, it appears that this forum is convenient to Defendant when it feels like it, such as when Defendant wants to intervene in a high-profile case. *See, e.g., VS Techs., LLC v. Twitter, Inc.*, 2011 WL 11074291, at * 7 (E.D. Va. 2011) ("transfer is inappropriate where it robs a plaintiff of his chosen forum and merely shifts the balance of inconvenience from defendant to plaintiff.").   Further, Defendant is a highly sophisticated and sprawling entity that does substantial business throughout Virginia, especially here in the Western District since the Unite The Right rally.  Defendant has not demonstrated that it will be difficult in any way to transport, transmit electronically, or produce any necessary documentary evidence in Virginia. *See, e.g., Titan Atlas Mfg. Inc. v. Sisk*, 2011 WL 3365122, at * 17 (W.D. Va. 2011) (noting that "in modem litigation, documentary evidence is readily reproduced and transported from one district to another" and finding defendants failed to demonstrate that their documentary evidence would be so voluminous as to create a great burden on them).

Accordingly, this factor does not strongly weigh in favor of transferring the case to the District of Columbia.  Indeed, it militates in favor of keeping the case here in Virginia.

### 3.  *Witness Convenience*

The third factor is witness convenience.  Courts have recognized that this factor is "of considerable importance" in the transfer analysis. *Rambus*, 386 F.Supp.2d at 718.  As a general matter, however, "a distinction is drawn between party and non-party witnesses." *Id.*  "[C]ourts have repeatedly emphasized that in considering whether to transfer a case under 28 U.S.C. § 1404(a), the inconvenience to a party witness is not afforded the same weight as the inconvenience to non-party witnesses." *USA Labs, Inc. v. Bio-Engineered Supplements & Nutrition, Inc.*, 2009 WL 1227867, at * 4 (E.D. Va. 2009).  While party witnesses are presumed to be more willing to testify in a different forum, there is no such presumption for non-party witnesses. *Rambus*, 386 F.Supp.2d at 718.

The party asserting witness inconvenience must offer "sufficient details respecting the witnesses and their potential testimony, by affidavit or otherwise, to enable the Court to assess the materiality of evidence and the degree of inconvenience." *Rambus*, 386 F.Supp.2d at 718 (quoting *Koh*, 250 F.Supp.2d at 636)); *id. Williams v. Big Picture Loans, LLC*, 2020 WL 1879675, at * 4 (E.D. Va. 2020) ("It is settled law in this district, indeed everywhere, that the party seeking transfer must support its motion with ***strong evidence*** of convenience and inconvenience.  As a general proposition this Court has long required, detailed evidence which would help analyze the issue of the difficulties that the parties face has to be provided.") (emphasis added).  To satisfy its burden that a

forum is inconvenient for witnesses, a movant must provide particularized information of a witness's potential testimony, how that testimony is material and non-cumulative, or the degree to which it will be inconvenient to access that testimony in this district. *Fitzgibbon*, 597 B.R. at 843 (citing *Koh*, 250 F.Supp.2d at 636-637)).  Additionally, the moving party must demonstrate "whether that witness is willing to travel to a foreign jurisdiction". *Rambus*, 386 F.Supp.2d at 719 (quoting *Thayer/Patricof Education Funding, LLC v. Pryor Resources, Inc.*, 196 F.Supp.2d 21, 33 (D. D.C. 2002)).

The burden of showing that the forum is inconvenient for witnesses is upon Defendant.  Like the defendant in *Rambus*, the ADL has failed to carry its burden. *See Rambus*, 386 F.Sup.2d at 719 ("Rambus points to the fact that many of its key party witnesses reside within the Northern District of California, and Rambus contends that their convenience would be served by a transfer to the Northern District of California. While this is no doubt true, Rambus has not shown that these witnesses, in fact, would not travel to this district to testify, if Rambus requested them to do so and paid their expenses").  Defendant proffers no information that **_any_** witness located in or around the District of Columbia, including Mark Pitcavage, will be burdened by having to travel to Charlottesville, Virginia, for trial. *Compare Thorpe v. Virginia Department of Corrections*, 2020 WL 1930036, at * 11-12 (E.D. Va. 2020) (the defendants submitted an affidavit in support of their request for a transfer that provided specific detail as to why specific non-party witnesses would be substantially inconvenienced by having to travel "368 miles" to the federal courthouse in Richmond); *Wenzel v. Knight*, 2015 WL 222179, at * 3 (E.D. Va. 2015) ("Rather than specify witnesses and the materiality of their testimony, the defendants make a fleeting reference to David Lerner Associates and a

non-specific assertion that 'many non-party witnesses are located' in the Eastern District of New York.").

As in *Fitzgibbon*, transferring the case to the District of Columbia will essentially benefit Defendant at the expense of Plaintiff.  So, this factor weighs in favor of Plaintiff. *Fitzgibbon*, 597 B.R. at 844; *Board of Trustees v. Baylor Heating and Air Conditioning, Inc.*, 702 F.Supp. 1253, 1258 (E.D. Va. 1988) ("Where "the original forum is convenient for plaintiff's witness, but inconvenient for defendant's witnesses, and the reverse is true for the transferee forum ... transfer is inappropriate because the result of transfer would serve only to shift the balance of inconvenience."); *see id. Vape Guys, Inc. v. Vape Guys Distribution, Inc.*, 2020 WL 1016443, at * 20 (E.D. Va. 2020) ("Similar to the second factor, the Court will not transfer the balance of inconvenience from Defendant to Plaintiff.").

Defendant also does not indicate that witnesses, including Pitcavage, cannot travel to Virginia or that videotape depositions will not suffice. *See Mullins*, 2006 WL 1214024 at * 8 ("[T]he moving party must demonstrate whether that witness is willing to travel to a foreign jurisdiction.") (internal quotation marks omitted).  Moreover, "merely asserting that a witness lives outside the subpoena power of the court is not enough to tip the scales in favor of transfer." *Rockingham Precast, Inc. v. America Infrastructure-Maryland, Inc.*, 2011 WL 5526092, at * 4 (W.D. Va. 2011); *Mullins*, 2006 WL 1214024 at * 8 ("Merely stating that potential witnesses reside beyond a forum's subpoena power does little to assist the court in weighing the convenience of the witness and the necessity of compulsory process.").  Again, "[w]ithout evidence that these witnesses are unwilling to testify voluntarily, this factor becomes less important." *Rockingham Precast*, 2011 WL

5526092 at * 4.  Although live testimony is the preferred mode of presenting evidence, videotaped depositions often are sufficient. *Mullins*, 2006 WL 1214024 at * 8. "Somewhat less weight is given to witness inconvenience when a party is unable to demonstrate with any particularity that videotaped deposition testimony will be inadequate, and that live testimony is critical." *Id.*  In this case, Defendant makes no attempt to argue that video depositions would be inadequate.

Overall, the third factor does not strongly weigh in favor of transferring the case to the District of Columbia.

### 4.    *Interests of Justice*

The final factor in the transfer analysis is the interest of justice, which "encompasses public interest factors aimed at systematic integrity and fairness." *Byerson v. Equifax Info. Servs., LLC*, 467 F.Supp.2d 627, 635 (E.D. Va. 2006).  Relevant considerations include: the court's familiarity with the applicable law, docket conditions, access to premises that might have to be viewed, the possibility of an unfair trial, the ability to join other parties, the possibility of harassment, the pendency of a related action, and the interest in having local controversies decided at home. *Fitzgibbon*, 597 B.R. at 844 (citing *Koh*, 250 F.Suppp.2d at 639)).

There is no interest of justice that would be better served by litigating this case in the District of Columbia.  As Defendant admits, there is no material difference in the law of the two Districts that controls Plaintiff's defamation claim.  Under Virginia law, the elements of defamation are "(1) publication of (2) an actionable statement with (3) the requisite intent." *Tharpe*, 737 S.E.2d at 892.  A defamation claim brought under District of Columbia law requires: "(1) a false and defamatory statement; (2) published without

privilege to a third party; (3) made with the requisite fault; and (4) damages." *Arpaio v. Zucker*, 414 F.Supp.2d 84, 89 (D. D.C. 2019) (quotations and citations omitted).  Further, Defendant has not shown why this Court would be unable to apply the substantive law of the District of Columbia.  Indeed, there is nothing unique about Plaintiff's substantive claims that would make it difficult for any district court to apply the governing law. *See Kentucky Fuel Corp. v. Summit Engineering, Inc.*, 2013 WL 6145746, at * 2 (W.D. Va. 2013) ("It is likely that because the performance of the instant contract occurred entirely in Kentucky, this court would be bound to apply Kentucky law … There is no indication, however, that Kentucky law is sufficiently unusual or obscure in this case as to limit the ability of this court to properly and fairly determine it.").  In this action, the fact that D.C. substantive law may apply does not tip the scales in favor of transfer. *See T. and B. Equipment Co., Inc. v. RI, Inc.*, 2015 WL 5013875, at * 5 (E.D. Va. 2015) (denying motion to transfer, where defendant asserted that transfer was appropriate because it was domiciled in New York and had its principal place of business in New York, and the contract at issue was governed by New York law).  Second, although not dispositive, Defendant fails to show that the "relative docket conditions" of the Western District of Virginia and the District of Columbia favor a transfer to the District of Columbia. [https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile1231.2019.pdf;].  Third, as in *Fitzgibbon*, Defendant has not forecast the need for a visit to any relevant location, and there is no other interest of justice that is relevant to the transfer issue.  Finally, in weighing all the factors, the District of Columbia does not provide a better or more convenient forum for the parties and witnesses as a whole.  In *Nelson v. Tidal Basin Holding, Inc.*, Judge Urbanski explained as follows:

"As the Complaint makes clear, the subject matter of this case relates to forums all over the country. Nelson alleges a nationwide collective action. He and the putative collective action members performed services all over the country, as defendants provide services across the country. Given that members of this action and witnesses to the members' work will come from all over the country, Nelson's desired forum in the Southern District of Texas provides a no more convenient forum than any other in the nation. *See Dean Foods Co. v. Eastman Chemical Co.*, 2000 W: 1557915, at * 4 (N.D. Ill. 2000) (concluding that, when witnesses would be called from many different states, convenience of the witnesses neither favored nor disfavored transfer)."

2019 WL 6107862, at * (3 (W.D. Va. 2019).

Viewing the facts in the light most favorable to Plaintiff, and resolving all issues in Plaintiff's favor, this dispute should be litigated in Virginia.

**D.**      ***Plaintiff Has Stated Claims Upon Which Relief May Be Granted***

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F,2d 8943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and procedure* § 1356 (1990)). To survive Rule 12(b)(6) scrutiny, a plaintiff's complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To this end, a complaint "need only give the defendant fair notice of what the claim is and the grounds upon which it rests." *Coleman v. Md. Ct. of Apps.*, 626 F.3d 187, 190 (4th Cir. 2010) (internal quotation marks omitted). A complaint achieves facial plausibility when the facts contained therein support a reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S. at 556; *see also Ashcroft v. Iqbal*, 556 U.S. 662 (2009). In ruling on a motion to dismiss under Rule 12(b)(6) for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the

light most favorable to the plaintiff, with all reasonable inferences being drawn in plaintiff's favor. *E.I. du Pont de Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, (4th Cir. 2011). A 12(b)(6) motion should only be granted if, "after accepting all well-pleaded allegations ... as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of [her] claim entitling [her] to relief." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).

### 1.    *COUNT I – Defamation*

The elements of a claim of defamation are "(1) publication of (2) an actionable statement with (3) the requisite intent." *Tharpe v. Saunders*, 285 Va. 476, 737 S.E.2d 890, 892 (2013). "To prevail on a claim for defamation, a party must prove by a preponderance of the evidence that the allegedly defamatory statements are both false and defamatory, so 'harm[ing] the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'" *Steele v. Goodman*, 382 F.Supp.3d 403, 418-419 (E.D. Va. 2019) (quoting *Cook, Heyward, Lee, Hopper, & Feehan, P.C. v. Trump Virginia Acquisitions, LLC*, 2012 WL 1898616, at * 3 (E.D. Va. 2012)).

Defamatory language "tends to injure one's reputation in the common estimation of mankind, to throw contumely, shame, or disgrace upon him, or which tends to hold him up to scorn, ridicule, or contempt, or which is calculated to render him infamous, odious, or ridiculous." *Schaecher v. Bouffault*, 290 Va. 83, 92, 772 S.E.2d 589 (2015) (citations omitted). A statement is defamatory *per se* if it "imputes an unfitness to perform the duties of a job or a lack of integrity in the performance of the duties" or if it

"prejudices the party in [his] profession or trade." *Tronfeld v. Nationwide Mutual Insurance Company*, 272 Va. 709, 713, 636 S.E.2d 447 (2006) (citing *Fleming v. Moore*, 221 Va. 884, 889, 275 S.E.2d 632 (1981)).

"False attribution of statements to a person may constitute libel, if the falsity exposes that person to … [hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation]". *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510-511 (1991) ("A fabricated quotation may injure reputation in at least two senses, either giving rise to a conceivable claim of defamation.  First, the quotation might injure because it attributes an untrue factual assertion to the speaker … Second, regardless of the truth or falsity of the factual matters asserted within the quoted statement, the attribution may result in injury to reputation because the manner of expression or even the fact that the statement was made indicates a negative personal trait or an attitude the speaker does not hold.") (citing *Selleck v. Globe International, Inc.*, 166 Cal.App.3d 1123, 1132, 212 Cal.Rptr. 838 (1985) ("Falsely ascribing statements to a person which would have the same damaging effect as a defamatory statement about him is libel"); *Kerby v. Hal Roach Studios, Inc.*, 53 Cal.App.2d 207, 213, 127 P.2d 577 (1942) ("A libel need not be a statement directly referring to a person and stating something defamatory about him.  It may as well be accomplished by falsely putting words into the mouth or attaching them to the pen of the person defamed and thus imputing to such person a willingness to use them, where the mere fact of having uttered or used the words would produce" harm to the plaintiff's reputation)); *Tharpe*, 737 S.E.2d at 894-895 (2013) ("*Saunders' statement of fact—*'Tharpe told me that Tharpe was going to screw the Authority like he did Fort Pickett'—

if believed by the hearer as coming from Tharpe, by its very nature is alleged to have defamed Tharpe and Shearin.  Therefore, regardless of the truth or falsity of the matters asserted in the quote attributed to Tharpe, Saunders' statement is an actionable statement of fact."); *Levesque v. Doocy*, 560 F.3d 82, 89-90 (1st Cir. 2009) (false attribution of comments to plaintiff encouraged listeners to form negative conclusions about plaintiff tending to harm his reputation); *Nelson v. Time, Inc.*, 2014 WL 940448, at * 1 (Cal. App. 2014) ("If a jury believes Nelson did not make the statements attributed to him, it could conclude that defendants' false attribution was made with knowledge of the falsity or reckless disregard for the truth.  Accordingly, Nelson has established a prima facie case of defamation and false light").

        "Pure expressions of opinion, not amounting to 'fighting words,' cannot form the basis of an action for defamation." *Chaves v. Johnson*, 230 Va. 112, 119, 335 S.E.2d 97 (1985) (statement that plaintiff was "inexperienced" was "pure expression of opinion"); "Pure expressions of opinion" include "speech which does not contain a provably false factual connotation, or … which cannot reasonably be interpreted as stating actual facts about a person." *Besen v. Parents and Friends of Ex-Gays, Inc.*, 2012 WL 1440183, at * 3 (E.D. Va. 2012) (quotation omitted); *see id. WJLA–TV v. Levin,* 264 Va. 140, 156, 564 S.E.2d 383 (2002) ("[s]peech that does not contain a provably false factual connotation" is generally considered "'pure expression[] of opinion.'").  "Statements that are relative in nature and depend largely upon the speaker's viewpoint are expressions of opinion." *Fuste v. Riverside Healthcare Ass'n,* 265 Va. 127, 132, 575 S.E.2d 858 (2003). Similarly, "rhetorical hyperbole, even if insulting, offensive, or otherwise inappropriate, is not actionable." *Choi v. Kyu Chul Lee*, 312 Fed. Appx. 551, 553 (4th Cir. 2009) ("the

jury found in favor of Choi with regard to the statements describing Choi as a thug and a gangster.  On appeal, the appellants contend that those statements should be viewed, as a matter of law, as non-actionable opinion or hyperbole.  We disagree.") (citation omitted).

The United States Supreme Court has not provided categorical protection for *all* expressions of opinion.  Rather, the Supreme Court has held that a statement merits protection if it "cannot 'reasonably [be] interpreted as stating actual facts about an individual.'" *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990) (alteration in original) (quoting *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50 (1988)).  To determine whether a statement posits facts, the United States Court of Appeals for the Fourth Circuit directs courts to look to the actual language used, as well as the context and general tenor of the statement. *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 184 (4th Cir. 1998) (citing *Milkovich*, 497 U.S. at 21)).  The Supreme Court of Virginia similarly requires an examination of context. *Hyland v. Raytheon Tech. Servs Co.*, 277 Va. 40, 47-48, 670 S.E.2d 746 (2009) ("The requirement that an allegedly defamatory statement be considered as a whole also is vital to a determination of the truth or falsity of a defamation claim, because defamatory statements may be made by implication, inference, or insinuation.  Thus, the factual portions of an allegedly defamatory statement may not be evaluated for truth or falsity in isolation, but must be considered in view of any accompanying opinion and other stated facts.") (citations omitted).  In *Goulmamine v. CVS Pharmacy, Inc.*, 138 F.Supp.3d 652 (E.D. Va. 2015), the Court observed that there are "two caveats to the 'opinions cannot be defamatory'" rule."  First, "statements [of opinion] may be actionable if they have a provably false connotation and are thus capable of being proven true or false." 138 F.Supp.3d at 660.  Second, a statement of opinion may

be actionable when it "reasonably can be construed as a statement of fact" because "it is 'laden with factual content' and the underlying facts are allegedly false." *Id.*   Bearing these two caveats in mind, the Court in *Goulmamine* held that many of the statements claimed to be "opinions" were actionable, "either because they may be proven false by an expert witness or because they are laden with factual content and the underlying facts are alleged to be false." *Goulmamine*, 138 F.Supp.3d at 660 (statements of opinion regarding Goulmamine or Goulmamine's relationship with his patients: "he is bad news," variations on "you should find another doctor" or "your doctor won't be in business much longer," and "he may lose his license" were actionable).

The requisite intent a plaintiff must prove in a defamation action depends upon the plaintiff's status as a public or private figure and the damages sought.   Where, as here, the plaintiff is a private individual [*Compl., ¶ 8*],[8] the plaintiff must allege that the defendant "acted negligently in failing to ascertain the facts on which the publication was based". *Gazette, Inc.*, 229 Va. at 15, 325 S.E.2d at 725 ("Under this standard, truth no longer is an affirmative defense to be established by the defendant.   Instead, the plaintiff must prove falsity, because he is required to establish negligence with respect to such

---

[8]      The presumption is that a plaintiff is a private individual, subject to the Defendant's burden of proving that the plaintiff is a public figure. *Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1543 (4th Cir. 1994).  Plaintiff is not a public figure and certainly not ***in relation to any particular public controversy at issue in this case***.  The fact that someone has a website and draws cartoons about matters of public concern does not make them a public figure.  Plaintiff has the same access to the Internet that everyone has.  He has the ability to create and maintain a website and to publish his artwork.  This does not make him a public figure.  Plaintiff did not voluntarily assume a role of special prominence or thrust himself in this public controversy.  He did ***nothing*** to provoke the Defendant's racist attacks.  The "controversy" – which is really a private issue that Defendant chose to make public using the Internet and social media – did not exist prior to the publication of the Defendant's defamatory statements.

falsity.  In addition, we hold that such liability may be based upon negligence, whether or not the publication in question relates to a matter of public or general concern.").

1. ***Defendant's Statements Are Actionable***

The Defendant's statements in the ADL Article and in the doctored cartoon,[9] published at a time of great partisanship and cultural division in this country and repeatedly smeared all over the Internet by Defendant and its agents, are actionable for two independent reasons:

First, Defendant's statements accusing Plaintiff of anti-Semitic and racist conduct are actionable. *See, e.g., Quigley v. Rosenthal*, 327 F.3d 1044, 1059-1060 (10th Cir. 2003) (statements made by representative attorney for ADL at press conference and on radio show alleging that homeowners were anti-Semitic and engaged in anti-Semitic harassment to chase neighbors of the Jewish faith from the community did not involve matters of public or general concern, and thus actual malice standard did not apply to homeowners' defamation claim); *Tech Plus, Inc. v. Ansel*, 793 N.E.2d 1256, 1265 (Mass.App. 2003) ("the judge erred in determining that the alleged statements about Piper being anti-Semitic and having persecuted Michael because of his Jewish heritage constituted nonactionable opinion merely because they concerned Piper's alleged state of mind … A given state of mind is a fact that can be proved like any other and, indeed, is proved in every criminal prosecution.") (citing *Ward v. Zelikovsky*, 136 N.J. 516, 538, 643 A.2d 972 (1994) (accusation of bigotry may be actionable where it is made "in such manner or under such circumstances as would fairly lead a reasonable listener to

---

[9]     The defamatory statements and the doctored cartoon at issue in this case were published and republished by Defendant and others on July 10, 2019, July 11, 2019, July 12, 2019, July 14, 2019, December 7, 2019, and June 10, 2020. [*Compl., ¶¶ 6, 13, 15, 16, 17*].

conclude that [the person making the accusation] had knowledge of specific facts supporting the conclusory accusation")); *Herlihy v. Metro. Museum of Art,* 214 A.D.2d 250, 261, 633 N.Y.S.2d 106, 113 (1st Dep't 1995) (because the "natural connotation of defendants' statements is that plaintiff was anti-Semitic and biased in her treatment of Jewish volunteers," a claim of slander per se was stated and defendants' motion for summary judgment on that cause of action was properly denied); *Rety v. Green*, 546 So.2d 410, 421-422 (Fla. 3rd DCA 1989) (in case in which the defendant falsely accused the plaintiff, a restauranteur, of making "vile anti-Semitic slurs", jury verdict for plaintiff in the sum of $22,500,000 was set aside as excessive with direction to enter remittitur of $7,500,000 on defamation claim); *Schermerhorm v. Rosenberg*, 73 A.D.2d 276, 284, 426 N.Y.S.2d 274 (1980) (the determination whether words are defamatory "depends, among other factors, on the temper of the times, the current of contemporary public opinion, with the result that words, harmless in one age, in one community, may be highly damaging to reputation at another time or in a different place" – held that uttering "anti-black" or "anti-Semitic" remarks is defamatory); *see Rambo v. Cohen*, 587 N.E.2d 140, 148 (Ind.App. 1992) (unpublished) ("We do not question that a charge of being anti-Semitic could be defamatory *per quod* given proof of special damages.").

In *Tech-Plus*, the evidence in the summary judgment record showed that the defendant not only branded the plaintiff with a Scarlett letter – labelling him "anti-Semitic" – "but also, as purported factual support for that statement, had asserted that Piper had told anti-Semitic jokes in his presence and was 'constantly persecuting' him because of his Jewish heritage."

> "In view of all the foregoing circumstances, we conclude that Michael's alleged assertions that Piper was anti-Semitic, had told anti-Semitic jokes in his presence, and was constantly persecuting him because of his Jewish heritage constituted assertions of fact, rather than constitutionally protected expressions of opinion. They, therefore, could provide the basis for a defamation claim."

793 N.E.2d at 1266.  In this case, by comparison, Defendant not only branded Plaintiff "anti-Semitic", but, as factual support for that horrible misrepresentation, Defendant pointed to Plaintiff's cartoons – the very lifeblood of Plaintiff's profession and livelihood.  The Defendant published the accusation of anti-Semitism as demonstrable fact.  As in *Tech Plus*, Defendant published and republished its statements not in response to any provocation from Plaintiff, but rather as part of a calculated effort to cause the White House to rescind its invitation to Plaintiff to attend the Social Media Summit. [*Compl., ¶¶ 5, 6*].  Because Defendant's statements concern a characteristic or qualification Plaintiff needs to be a successful cartoonist, *i.e.,* an ability to deal with, and attract as customers, persons of all religions and ethnic backgrounds, the statements are actionable *per se* without proof of any special damages in the form of economic loss or harm. *Tech Plus*, 793 N.E.2d at 1267.

Second, Defendant's statements in the doctored cartoon are defamatory and actionable because they falsely attribute to Plaintiff views he does not have and statements he never made. *See Masson; Tharpe supra*.

### 2.    *Actual Malice*

Plaintiff is a private individual. [*Compl., ¶ 8*].  Even if Plaintiff was a "public figure" subject to the burdens of *New York Times v. Sullivan* – which he is not –, Plaintiff alleges several inter-related bases in support of his contention that Defendant acted with

*New York Time* actual malice – knowledge of falsity or reckless disregard for the truth.[10] [*See Compl., ¶¶ 14, 15, 24*].

    1.    From prior reporting, Defendant knew that Plaintiff was not anti-Semitic. *See, e.g., Palin v. New York Times*, 940 F.3d 804, 813-814 (2ⁿᵈ Cir. 2019) (based upon the defendant's prior reporting, "a jury could plausibly find that Bennet knew before publishing the editorial that it was false to claim that Palin or her political action committee were connected to the Loughner shooting").

    2.    Defendant intentionally doctored a cartoon, and attributed to Plaintiff racist and disparaging comments about Jews ***and*** non-Jews ("goyim") that Plaintiff never made and views Plaintiff has never held.  Paragraph 6 of the complaint provides a "redline" comparison of Plaintiff's cartoon and Defendant's bad faith fabrications:



---

    10    To demonstrate "actual malice" under the *New York Times* standard, a plaintiff must demonstrate that the defendant in fact entertained serious doubts as to the truth of the statement or acted with a high degree of awareness of its probable falsity. *See, e.g., St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).  The *St. Amant* Court emphasized that a defendant in a defamation action brought under the actual malice standard cannot "automatically insure a favorable verdict by testifying that he published with a belief that the statements were true.  The finder of fact must determine whether the publication was indeed made in good faith." *Id.* at 732.  As examples of bad faith, the Court offered several examples, including the situations where the defendant (a) wholly fabricates the statement, or (b) relies on an informant whose veracity is obviously dubious. *Id.*

Defendant's action are a shameful example of racism practiced by an organization that solicits hundreds of millions of dollars from Virginians and others annually to fight racism.[11]   The doctored cartoon demonstrates Defendant's intent and endorsement of the defamatory meaning, and evidences Defendant's actual malice.   If a jury believes Plaintiff did not make the statements attributed to him, it could conclude that Defendant's false attribution was made with knowledge of the falsity or reckless disregard for the truth.

3.   Defendant reiterated, repeated and continued to publish the false defamatory statements to the broadest possible audience online and via Twitter out of a desire to hurt Plaintiff and to cause the White House to rescind the Social Media Summit invitation.   This is an egregious disregard for the truth. *Eramo v. Rolling Stone, LLC*, 2016 WL 5234688, at * 5 (W.D. Va. 2016) ("Repetition of another's words does not release one of responsibility if the repeater knows that the words are false or inherently improbable, or there are obvious reasons to doubt the veracity of the person quoted.") (quoting *Goldwater v. Ginzburg*, 414 F.2d 324, 327 (2nd Cir. 1969), *cert. denied*, 396 U.S. 1049 (1970) (stating that repetition is one factor that may be probative of actual malice)); *Snyder v. Fatherly*, 158 Va. 335, 354, 163 S.E. 358 (1932) ("'it is considered competent for the plaintiff to show, as evidence of malice, that since the speaking or publication of the slander or libel … the defendant has repeated or republished the same,

---

[11]   The kind of inexcusable racism practiced by the Anti-Defamation League in the doctored cartoon has been described by one Court as "virulently anti-Semitic". *Uzamere v. Daily News, L.P.*, 2011 WL 6934526, at * 2 (N.Y. Sup. 2011) ("In one posting [on his website], Plaintiff displays pictures of Mayor Bloomberg, former Chief Judge Judith Kaye, Judge Nicholas Garaufis, and others with devil's horns in front of a fiery backdrop.  Above the picture reads, 'Allen E. Kaye And His Diabolical Talmud-Following Minions—Even African American Civil Rights and Religious Leaders Are No Match For Them'").

even though such repetition or republication has taken place since the commencement of the action'") (quotation omitted); *Williams Printing Co. v. Saunders*, 113 Va. 156, 73 S.E. 472, 474 (1912) ("Any other words written or spoken by the defendant of the plaintiff, either before or after those sued on, or even after the commencement of the action, are admissible to show the animus of the defendant … The more the evidence approaches proof of a systematic practice of libeling or slandering the plaintiff, the more convincing it will be.").

Actual malice is a question of fact for the Jury.  It is a fact-intensive inquiry that cannot be resolved on a motion to dismiss under Rule 12(b)(6).  In order to determine whether actual malice exists, the Court must review the totality of the circumstances.  The issue cannot be resolved by looking at any one factor alone.  In *Harte-Hanks Communications, Inc. v. Connaughton*, for example, the United States Supreme Court held that the "failure to investigate will not **alone** support a finding of actual malice." 491 U.S. 657, 692 (1989) (emphasis added); *see also Eramo*, 2016 WL 5234688, at * 5 ("Although failure to adequately investigate, a departure from journalistic standards, or ill will or intent to injure will not singularly provide evidence of actual malice, the court believes that proof of all three is sufficient to create a genuine issue of material fact.  Plaintiff, however, goes further.  Pointing to Erdely's own reporting notes, plaintiff also forecasts evidence that could lead a reasonable jury to find that Erdely had 'obvious reasons to doubt [Jackie's] veracity' or 'entertained serious doubts as to the truth of [her] publication.'").

Even if Plaintiff was a public figure, he alleges actual malice.

34

2.  __*COUNT II – Conversion*__

Conversion is the wrongful exercise or assumption of authority, personally or by procurement, over another person's property, depriving such other person of possession. An act of dominion wrongfully exerted over property in denial of the owner's right, or inconsistent with it, amounts to a conversion.   Conversion occurs when a person exercises control over another's property without authorization from the rightful owner to do so. *United Leasing Corporation v. Thrift Ins. Corp.*, 247 Va. 299, 305, 440 S.E.2d 902 (1994); *Universal C.I.T. Credit Corp. v. Kaplan*, 198 Va. 67, 75-76, 92 S.E.2d 359 (1956) ("Any distinct act of dominion wrongfully exerted over the property of another, and in denial of his rights, or inconsistent therewith, may be treated as a conversion."); *Bonumose Biochem, LLC v. Yi-Heng Zhang*, 2018 WL 10069553, at * 18 (W.D. Va. 2018) ("While a claim for conversion traditionally has been a means to recoup tangible property, 'courts have recognized the tort of conversion in cases where intangible property rights arise from or are merged with a document' …  So, for example, federal courts applying Virginia law have allowed conversion claims "based exclusively on the transfer of copies of electronic information" to proceed past the pleading stage where the complaint plausibly alleged 'that the purloining of copies of documents ... [was] an act of 'dominion' inconsistent with the true owner's property rights.") (quoting *E.I. DuPont de Nemours & Co. v. Kolon Industries, Inc.*, 688 F.Supp.2d 443, 454-455 (E.D. Va. 2009)). "It is not necessary that there be a manual taking of the property; it is only necessary to show an assumption of control or ownership over the property, or that the alleged converter has applied the property to his own use." *Fed. Ins. Co. v. Smith*, 144 F.Supp.2d 507, 520 (E.D. Va. 2001) (citation omitted).

In *Three Rivers Landing of Gulfport, L.P. v. Three Rivers Landing, LLC*, 2013 WL 5492936 (W.D. Va. 2013), the District Court rejected the argument that a defendant's "good-faith belief that he had authority … to take the funds constitutes sufficient 'mitigation' to send the conversion claim to trial.  While it may explain why Kinser [the defendant] did what he did, it does not undercut the conversion claim because a defendant's belief that he had a right to the property is no defense to conversion.  That is, "one may be held liable in conversion even though he reasonably supposed that he had a legal right to the property in question." 2013 WL 5492936 at * 5 (quoting *Morissette v. United States*, 342 U.S. 246, 270 fn. 31 (1952)).  In *Morissette,* the Supreme Court explained the rationale for this rule:

> "[In the tort of conversion,] the defendant's knowledge, intent, motive, mistake, and good faith are generally irrelevant.  If one takes property which turns out to belong to another, his innocent intent will not shield him from making restitution or indemnity, for his well-meaning may not be allowed to deprive another of his own."

*Id.* at * 6.

Plaintiff's cartoons are his personal property.  The Defendant wrongfully converted Plaintiff's cartoon when it altered and doctored the cartoon, and republished it on Defendant's website. [*Compl., ¶ 27*].  Plaintiff's common law conversion claim does not rest on an allegation of wrongful copying and distribution of intellectual property.  The claim is not preempted by § 301 of the Copyright Act.[12]

---

[12]     In the event that the Court finds that Plaintiff's common law conversion and trespass to chattels claims are preempted, Plaintiff respectfully requests leave to file an amended complaint to assert claims under § 18.2-152.3(3) (unauthorized use of a computer to convert property) and § 18.2-152.4(A)(5) of the Virginia Code (computer trespass). *See Maxient, LLC v. Simplicity Corp.*, 63 F.Supp.3d 592, 598 (E.D. Va. 2014) (computer fraud claim not preempted).

**3.**      *__COUNT III – Trespass to Chattels__*

Like conversion, trespass to chattels is an intentional tort. *Garcia v. U.S. Bank*, 141 F.Supp.3d 490, 497 (E.D. Va. 2015) ("The duty not to intermeddle with the personal property of another is 'owed by everyone to everyone.'") (citing *Hewlette v. Hovis*, 318 F.Supp.2d 332, 337 (E.D. Va. 2004)).   "Trespass to chattels" is defined as "[a]n unlawful and serious interference with the possessory rights of another to personal property." Black's Law Dictionary, 1503 (6th ed.1990).   "A trespass to chattels occurs 'when one party intentionally uses or intermeddles with personal property in rightful possession of another without authorization,' and 'if the chattel is impaired as to its condition, quality, or value.'" *State Analysis, Inc. v. Am. Fin. Servs. Assoc.*, 621 F.Supp.2d 309, 320 (E.D. Va. 2009) (quoting *Am. Online, Inc. v. LCGM, Inc.*, 46 F.Supp.2d 444, 451-452 (E.D. Va. 1998)); *see id. Vines v. Branch*, 244 Va. 185, 190, 418 S.E.2d 890 (1992) ("Where a person has illegally seized the personal property of another and converted it to his own use, the owner may bring an action in trespass").

In his complaint, ¶¶ 31-35, Plaintiff plausibly alleges a claim of common law trespass to his cartoon that is not preempted.   The Defendant clearly and unmistakably impaired the condition or quality of Plaintiff's cartoon with its racist alterations.

## CONCLUSION

For the reasons stated above, Defendant's omnibus motion to dismiss should be denied.

DATED:        December 21, 2020

BEN GARRISON


By:   */s/ Steven S. Biss*
      Steven S. Biss (VSB # 32972)
      300 West Main Street, Suite 102
      Charlottesville, Virginia 22903
      Telephone:      (804) 501-8272
      Facsimile:      (202) 318-4098
      Email:          **stevenbiss@earthlink.net**

      *Counsel for the Plaintiff*


## CERTIFICATE OF SERVICE

I hereby certify that on December 21, 2020 a copy of the foregoing was filed electronically using the Court's CM/ECF system, which will send notice of electronic filing to counsel for the Defendant and all interested parties receiving notices via CM/ECF.


By:   */s/ Steven S. Biss*
      Steven S. Biss (VSB # 32972)
      300 West Main Street, Suite 102
      Charlottesville, Virginia 22903
      Telephone:      (804) 501-8272
      Facsimile:      (202) 318-4098
      Email:          **stevenbiss@earthlink.net**

      *Counsel for the Plaintiff*